## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOHN ENSEY,

     Plaintiff,

v.                                     No. 08-CV-00801 JAP/CG

OZZIE'S PIPELINE PADDER, INC.,

     Defendant.

## MEMORANDUM OPINION AND ORDER

On July 24, 2009, Defendant Ozzie's Pipeline Padder, Inc. ("Ozzie's") filed Motion for Summary Judgment by Ozzie's Pipeline Padder, Inc. (Doc. No. 49).  Then, on August 20, 2009, Plaintiff John Ensey ("Ensey") filed Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 51).  Finally, on September 11, 2009, Ozzie's filed Defendant's Reply Brief in Support of Its Motion for Summary Judgment (Doc. No. 54).  The parties argued their motions at the pretrial conference on September 17, 2009.  Having considered the parties' briefs, the arguments raised at the pretrial conference, and the applicable law, the Court finds that Ozzie's Motion for Summary Judgment should be granted in part and denied in part.

## BACKGROUND

Ozzie's designed and manufactured various models of pipeline padding machines, including the OPP-300, the model at issue in this case.  During the period relevant to this case, Ozzie's did not sell the OPP-300 to the general public, but instead rented the machine to general contractors under a lease agreement.  The machine required a trained operator to run it and Ozzie's provided that training to certain individuals.

Ozzie's hired Ensey to be an OPP-300 operator in August 2005. Ensey immediately began Ozzie's training program, which largely consisted of on-the-job training and observing the operation of the machine. After training at a job in Wyoming, Ensey traveled to New Mexico to undergo additional training and to work on a job for Rockford Corporation ("Rockford"), a general contractor leasing an OPP-300 from Ozzie's. Ozzie's paid for Ensey's travel to New Mexico. After Ensey completed his training, he went on the payroll of Rockford and Rockford subsequently assumed responsibility for Ensey's wages, benefits and worker's compensation insurance. However, Ozzie's continued to pay Ensey's hotel expenses and a *per diem* fee while Ensey was in New Mexico, but Rockford was required to reimburse Ozzie's for those expenses under the terms of the lease.

During the time that Ensey worked for Rockford, he submitted weekly reports to Ozzie's regarding the number of hours he worked, the number of feet padded during each work day, and the machine's operating hours. Ensey denies that these reports were used to monitor his activities and asserts that they were used to calculate "truck pay," which apparently relates to the rental rate for the machine. Ozzie's claims that it could replace any machine operator that was performing poorly. Ensey denies that Ozzie's retained that authority, but acknowledges that Ozzie's could provide a substitute machine operator in the event that the regular operator was absent.

On October 19, 2005 while Ensey was still working on the job for Rockford, he stepped onto a moving conveyor on the OPP-300 and was seriously injured after being pulled through the machine. The accident occurred as Ensey was inspecting the machine before beginning operations. Ensey acknowledges that he saw the belt moving

before he stepped on it, but claims that the conveyor suddenly increased in speed the instant he stepped on it.  Part of the basis for his claims in this case is his allegation that Ozzie's never trained him not to step on the conveyor.

Following the accident, Ozzie's dispatched one of the individuals who assisted in designing the OPP-300 to inspect that machine for defects.  According to Ozzie's, that inspection did not reveal any defects, and Ozzie's thus left the remainder of the investigation of the accident to Rockford.  Ensey contends that Ozzie's investigation was insufficient.

After he recovered from his injuries, Ensey returned to work for Ozzie's as a management trainee.  At that time, Ozzie's moved Ensey back onto its payroll.  Ensey temporarily operated the OPP-300 during this term of employment when another qualified operator was not available to assist with a job in Colorado; however, he almost exclusively conducted office work in his second employment.

On March 9, 2007, Ensey signed a termination agreement with Ozzie's in which he signed a waiver of all claims against Ozzie's arising from his employment or relating to his termination in exchange for pay and extended benefits.  The parties dispute the scope and effect of that waiver.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, the Court examines "the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir.

2005) (citation omitted). "Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof." *Id.* (citation omitted). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). "Unsupported conclusory allegations, however, do not create an issue of fact," *id.* (citation omitted); neither does "evidence, including testimony, . . . based on . . . mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citation omitted). However, "it is not [the Court's] province at the summary judgment stage to weigh evidence or make credibility determinations." *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

## DISCUSSION

## I.    Applicability of the Worker's Compensation Act Exclusivity Provision

Ozzie's moves for summary judgment on all of Ensey's claims based on the exclusivity provision of the New Mexico Worker's Compensation Act (the "Act"). In support of its motion in this regard, Ozzie's cites to NMSA 1978 § 52-1-9, which provides that:

> The right to the compensation provided for in this act, in lieu of any other liability whatsoever, to any and all persons whomsoever, for any personal injury accidentally sustained or death resulting therefrom, shall obtain in all cases where the following conditions occur:
>> A. at the time of the accident, the employer has complied with the provisions thereof regarding insurance;
>> B. at the time of the accident, the employee is performing service arising out of and in the course of his employment; and
>> C. the injury or death is proximately caused by accident arising out of and in the course of his employment and is not intentionally self-inflicted.

4

Accordingly, for the provisions of the Act to apply, the injured party must be an employee of the entity against whom he brings the claim, that entity must have complied with the insurance provisions of the Act, and the injury complained of must have stemmed from conduct "arising out of and in the course of" the injured party's employment.  *Id.*

The central issue in this case concerning the applicability of the exclusivity provision of the Act is whether Ensey was an employee of Ozzie's at the time of the accident.  Whether an individual is an employee is generally a question of fact.  *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶12, 137 N.M. 339, 110 P.3d 1076.  "However, where reasonable people cannot differ on the issue, the court may grant summary judgment."  *Id.*  "The primary test to determine employment status is the right to control the details of the work."  *Perea v. Torrance Bd. of County Commr's*, 77 N.M. 543, 545, 425 P.2d 308, 309 (1967)(noting that "[t]he primary test to determine employment status is the right to control the details of the work.").  While the Court must consider the totality of the circumstances in making that determination, several factors guide the analysis, including:

> (1) the extent of control which the master may exercise over the details of the work; (2) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (3) the length of time for which the person is employed; (4) the method of payment, whether by the time or by the job; and (5) 'the right to delegate the work or to hire and fire assistants.'

*Headley*, 2005-NMCA-045, ¶12.

Ozzie's advances two alternate theories regarding Ensey's employment status, each of which, Ozzie's argues, establishes that Ensey was an employee of Ozzie's at the

5

time of the accident and thus limits Ensey's potential remedies against Ozzie's to those

provided by the Act.  Initially, Ozzie's argues that Ensey was an employee solely of

Ozzie's because Ozzie's hired Ensey to be an OP-300 machine operator and kept Ensey

on its payroll during his training.  Ozzie's further argues that Ensey continued to be an

employee following his training and at the time of his accident because:

> Ozzie's trained Ensey to operate the Machine.  Rockford, as the special
> employer, never instructed Ensey regarding operation of the Machine.
> Ensey was to contact Ozzie's with any questions regarding the Machine.
> Ozzie's provided the Machine to Ensey for operation.  Ensey was referred
> to the Rockford job by Ozzie's and he would have been referred to another
> job had he not been injured in the accident.  Ozzie's had the right to
> remove Ensey from the job or to provide a replacement in the event Ensey
> was absent.  Ensey was on Rockford's payroll and covered by worker's
> compensation insurance at the direction of Ozzie's.  Ozzie's paid for
> Ensey's hotel expenses and a *per diem* for travel for nearly $100 per day.
> Ensey was also expected to comply with Ozzie's policies while operating
> the Machine.

(Mot. Summ. J. at 15.)

Alternatively, Ozzie's contends that Ensey was an employee of both Ozzie's and

Rockford, the latter acting as a "special employer."  Ozzie's cites to *Vigil v. Digital*

*Equip. Corp.*, 1996-NMCA-100, ¶ 17, 122 N.M. 417, 925 P..2d 883, which defined a

special employer as one that "'borrows' a worker from another employer and directs the

borrowed worker in specific details." Determining whether an entity is acting as a

special employer requires the Court to examine whether: (1) the employee has a contract

of hire with the special employer; (2) the work done is that of the special employer; and

(3) the special employer has a right to control details of the work.  *Id.*, 1996-NMCA-100,

¶ 16.

6

While Ozzie's acknowledges that the cases examining the "special employer" relationship generally arose in the context of employment staffing agencies, it asserts that in this case "Ozzie's in effect acted as a staffing agency by providing Rockford with an operator it trained to operate the Machine . . .." (Mot. Summ. J. at 16.)   Ozzie's argues that it remained Ensey's direct employer, even though Ensey was no longer on its payroll, and Rockford was Ensey's "special employer," meaning that Ensey's remedies against Ozzie's are limited to those provided by the Act.

In response, Ensey argues that he was employed solely by Rockford at the time of the accident.  Ensey points out that "Ozzie's only agreed to provide the names of qualified Operators for the duration of the project," and notes that "[t]here is no discussion in the Contract about any leased, borrowed or assigned 'employees.'" (Resp. at 11.)  Also, Ensey cites to the deposition of Ozzie's General Manager, Tom Sarauskas, in which Sarauskas described the machine operators as "union individuals . . .They work when there's work. They do not work directly for us full time . . .,"  (*Id.*, quoting Sarauskas Dep.,  39:10-13, attached as Ex. C to Mot. Summ. J.). Sarauskas further observed that "operators are union employees . . . they are not—with the exception of when they were training – direct employees of Ozzie's . . ." (*Id.*, quoting Sarauskas Dep., 111:14-25).

Additionally, Ensey asserts that the *Headley* factors vitiate Ozzie's claim that it was Ensey's employer at the time of the accident.  First, Ensey claims that only Rockford controlled the everyday details of his employment by retaining authority over Ensey's schedule and the selection of projects, and disputes the notion that Ozzie's could fire Ensey, claiming that only Rockford could do so.  Second, Ensey maintains that Rockford

leased the OPP-300 for Ensey's use and controlled how and when he used it. Furthermore, according to Ensey, Rockford provided Ensey with a hard hat, gloves, safety vests, oil, grease, grease gun, safety equipment, diesel and the other supplies he needed to perform his job.  Third, Ensey notes that Rockford paid all of his wages, benefits, worker's compensation insurance, and expenses.  Ensey disputes Ozzie's contention that it paid Ensey's hotel and per diem expenses, arguing that Rockford reimbursed Ozzie's for those expenses in accordance with the terms of the contract between Rockford and Ozzie's.  Finally, Ensey argues that Ozzie's did not meet its obligations under the Act because Ozzie's did not provide or pay for worker's compensation insurance but instead relied on Rockford to do so.

Ensey also contends that Ozzie's reliance on the "special employer" cases is misplaced.   Ensey argues that "[t]he cases cited by Ozzie's generally involve the question of whether a special employer, who borrows an employee from the staffing company and who does not directly pay for workers' compensation insurance, is covered by the Workers' Compensation Act.  The court in those cases w[as] not even asked to analyze whether the employees were employed by the staffing agencies."  (Resp. at 12)(internal citations omitted).  Accordingly, Ensey claims that "[t]hese cases are inapposite here, where the alleged 'staffing agency' did not retain any control over Ensey, did not direct his work and did not even pay for his workers' compensation coverage . . .."  (*Id.*)

Although Ozzie's asserts that the issue of Ensey's employment status in properly resolved on summary judgment, the Court does not agree.  Ensey has pointed to specific portions of the record, including testimony from Ozzie's General Manager, that raise

8

genuine and material factual disputes regarding whether Ozzie's employed Ensey at the time of his accident. Likewise, because the issue of whether Ozzie's was Ensey's employer is inextricably linked to the "special employer" analysis, *see Vigil*, 1996-NMCA-100, ¶ 17 (noting that a special employer borrows a worker from *another employer*), a sufficient material factual dispute exists to preclude summary judgment on that basis.  Therefore, Ozzie's motion in this regard should be denied.

## II.     Product Liability Claims

Ozzie's also moves for summary judgment on Ensey's product liability claims. Generally, Ozzie's argues that Ensey lacks evidence to support his product liability claims on either a theory of strict liability or negligence.

### A.     Strict Product Liability

New Mexico follows a theory of strict liability for cases involving product manufacturers.  *See Stang v. Hertz Corp.*, 83 N.M. 730, 497 P.2d 732 (1972).  To prevail on a claim of strict product liability against a product manufacturer, the plaintiff must prove:

> (1) the product was defective;
> (2) the product was defective when it left the hands of the defendant and was substantially unchanged when it reached the user or consumer;
> (3) that because of the defect the product was unreasonably dangerous to the user or consumer;
> (4) the consumer was injured or was damaged;
> (5) the defective condition of the product was the proximate cause of the injury or damage.

*Tenney v. Seven-Up Co.*, 92 N.M. 158, 159, 584 P.2d 205, 206 (Ct. App.1978).  As the New Mexico Court of Appeals explained in *Salinas v. John Deere Co.,* 103 N.M. 336, 707 P.2d 27 (Ct. App. 1984), "[a] product is defective if its condition or the manner of its use

creates an unreasonable risk of injury and was the proximate cause of injury. The plaintiff may rely on circumstantial evidence. The question of whether a product is unreasonably dangerous ordinarily is a question for the jury." *Id.*, 103 N.M. at 341, 707 P.2d at 32.

Ozzie's argues that Ensey has failed to set forth any evidence to support his claim for strict product liability. In support of that argument, Ozzie's contends that Ensey's expert "does not do design work and is not prepared to testify regarding an alternative design for the Machine. Moreover, [Ensey's expert] is not prepared to testify regarding warnings on or the training of Ensey to operate the Machine." (Mot. Summ. J. at 17-18.) Therefore, Ozzie's argues, summary judgment on Ensey's strict product liability claim is appropriate due to a lack of evidence supporting that claim.

In response, Ensey essentially argues that he has enough evidence supporting his claim to survive summary judgment. Ensey raises several points related to Ozzie's safety policies and the training of its employees that purportedly evince a defective product, but really appear more appropriate as support for his claim of negligence. Additionally, Ensey contends that "Ozzie's own employees, its safety manager and its director of training have also offered significant testimony about the function of the safety switch that contributed to Ensey's injuries. There is a general lack of understanding and agreement as to what the switch does and how it affects the operation of the conveyor belt." (Resp. at 17.) However, the testimony to which Ensey cites in support of that contention does not actually suggest any such dispute or confusion. (*See* Looney Dep. 47:13-19 & 23-25; 51:7-15, attached as Ex. E to Resp.)

More relevant to the alleged defectiveness of the OPP-300, Ensey argues that "the machine had no safety devices or policies forbidding or preventing operators from climbing on to the machine from the platform or clean the shaker while the machine is running," despite acknowledgment from Ozzie's officials that operators at times take short-cuts and step on the machine.  (Resp. at 18.)  Furthermore, Ensey asserts that Ozzie's failed to "train and warn the operators about key safety issues relating to its machines." (*Id.*) However, once again, the evidence to which Ensey cites does not directly support his argument, with the exception of the failure to warn about the dangers of stepping on the conveyor, but instead requires a great deal of conjecture to arrive at his proposition.

At the pretrial conference, Ensey conceded that he does not have evidence to support a claim of any mechanical defect on the OPP-300. (Pretrial Conf. Tr. at 23)(Doc. No. 58.)  However, he indicated his intent to pursue a strict product liability claim on a theory of inadequate warnings.

Generally, "where the seller 'has reason to anticipate the danger that may result from a particular use . . . he may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition." *Perfetti v. McGhan Med.*, 99 N.M. 645, 650, 662 P.2d 646, 649 (Ct. App. 1983).  Accordingly, the principles of strict product liability apply to claims alleging such a defect.  *See generally id.*  It is important to note, though, that the plaintiff generally must present evidence of the alleged defectiveness of the warning at the time of the accident and may not rest solely on subsequent modifications to the product warnings or the addition of other safety measures as the basis for his claim.  *See Spectron Dev. Lab. v. American Hollow Boring*

11

*Co.*, 1997-NMCA-025, ¶ 13, 123 N.M. 170, 936 P.2d 852 (noting that plaintiffs must show the alleged defect existed at the time of sale or distribution); *cf. Garcia v. Fleetwood Enterprises, Inc.*, 200 F. Supp. 2d 1302, 1304-05 (D.N.M. 2002)(finding that Rule 11-407 NMRA, which generally excludes evidence of subsequent remedial measures, applies to product liability cases); *see also Moe v. Avison Marcel Dassault-Brequet Aviation*, 727 F.2d 917, 932 (10th Cir. 1984)(holding that "when state courts have interpreted [Federal] Rule [of Evidence] 407 or its equivalent state counterpart, the question of whether subsequent remedial measures are excluded from evidence is a matter of state policy.... If a state has not announced controlling rules, such as New Mexico, the federal court, sitting as a state court in a product liability diversity case, must determine whether Rule 407 applies.")(internal citation omitted).  While Rule 11-407 NMRA 2009 "does not require the exclusion of evidence of subsequent measures when offered for a[] purpose [other than proving negligence or culpable conduct], such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment," it is axiomatic that for such evidence to be admissible questions of ownership, control, or feasibility must be at issue in the case.  No such dispute exists here.

The only evidence Ensey proposes to offer regarding the alleged defectiveness of the warnings for the OPP-300 is a letter from Ozzie's, which purportedly discusses safety features added to the OPP-300 following Ensey's accident. (*See* Pretrial Conf. Tr. at 24-26.) Ensey acknowledges that he does not have any expert testimony concerning the adequacy of the warnings.  (*Id.* at 26.)  Additionally, Ensey did not present any evidence in his response to Ozzie's motion for summary judgment suggesting that the

12

warnings on the OPP-300 were deficient at the time of Ensey's accident nor did he claim to have any such evidence at the pretrial conference.  Hence, the only evidence to support Ensey's claim in this regard would not be admissible at trial and thus does not provide an adequate basis on which to resist summary judgment.  *See Law Co. Inc. v. Mohawk Constr. and Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009)(noting that "[w]hile the party opposing summary judgment need not produce evidence in a form that would be admissible at trial, the content or substance of the evidence must be admissible.").  Therefore, the Court finds that summary judgment should be entered in favor of Ozzie's on Ensey's claim for strict product liability.

B.   Negligence

As with Ensey's strict product liability claim, Ozzie's argues that Ensey lacks any evidence to support a claim of negligence. Ensey responds that a material factual dispute exists with regard to Ozzie's negligence that precludes summary judgment on this claim. Specifically, Ensey claims that Ozzie's officials knew that machine operators engaged in the kind of conduct that led to Ensey's injuries and despite that knowledge "did not create safety devices, adequate warnings or a safety manual that addressed these issues." (Resp. at 19.)  Ensey further alleges that "Ozzie's developed the machine without any consideration for safety, [and] there remains no safety manual," all of which Ensey claims demonstrates that Ozzie's was aware of the danger posed by the OPP-300 and failed to exercise ordinary care to prevent Ensey's injuries. (*Id.*)  Ensey supports these claims with essentially the same deposition testimony that he used to support his strict product liability claim.

"Negligence focuses on conduct. Strict liability focuses on the product. Proof of what a manufacturer knew or should have known is the measure of conduct. It is largely dependent upon memories of employees and consultants, and upon the retention and production of business records. Proof of the risks of harm from a product's condition or from the manner of its use is the measure of a product defect." *Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 378, 902 P.2d 54, 60 (1995). "It is fundamental that in order to prevail under [a] claim of negligence, [the plaintiff is] required to establish (1) the existence of a duty owed to Plaintiff[], (2) a breach of such duty, (3) a causal connection between [the] conduct and the injury to Plaintiff[], and (4) damages resulting from such conduct. Whether a person has breached a duty also involves the question of foreseeability." *Parker v. E.I. DuPont de Nemours & Co., Inc.*, 121 N.M. 120, 130, 909 P.2d 1, 11 (Ct. App. 1995)(internal citations omitted).

"Determining the existence of a duty is a question of law for the court, whereas breach of duty and proximate cause are questions of fact for the jury." *Lessard v. Coronado Paint & Decorating Center, Inc.*, 2007-NMCA-122, ¶ 27, 142 N.M. 583, 168 P.3d 155 (internal citations omitted). In the product liability context, "[t]he supplier's duty is to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge. If he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied." *Parker*, 120 N.M. at 130, 909 P.2d at 11 (internal citation omitted).

While the evidence Ensey offers to support his product liability claim does not suffice to establish a triable issue concerning strict product liability, it is sufficient to create a material factual dispute with regard to negligence. Generally, Ensey asserts that

there is evidence of a lack of safety equipment, policies, training and warnings that could have prevented Ensey's injury. Specifically, Ensey points to the deposition testimony of Tom Sarauskas, in which Sarauskas stated that Ozzie's did not train its machine operators not to step on the conveyor. (Sarauskas Dep. 109:3-24, attached as Ex. C to Resp.)  Additionally, Ensey notes that Ozzie's did not maintain official, written standards for training machine operators (Sims Dep. 41:9-19, attached as Ex. B to Resp.) and places great emphasis on the fact that the word safety never appears in the OPP-300 manual.  The Court finds that the deposition testimony Ensey has presented could lead a reasonable jury to conclude that Ozzie's was negligent, and therefore concludes that Ozzie's motion for summary judgment on Ensey's claim for negligence should be denied.

### III.   Breach of Warranty Claims

Ozzie's also moves for summary judgment on Ensey's breach of warranty claims. Ensey did not respond to this portion of Ozzie's motion.  However, at the pretrial conference, Ensey conceded all of his breach of warranty claims.  (Pretrial Conf. Tr. at 30.)  Therefore, in light of that concession, the Court finds that Ensey's breach of warranty claims should be dismissed with prejudice.

### IV.   Waiver of Claims

Next, Ozzie's moves for summary judgment on all of Ensey's claims based on its assertion that Ensey waived all of his claims against Ozzie's.  On March 9, 2007, Ensey signed a termination of employment agreement that contained the following language:

> I agree to and accept the terms of my severance as set out above in full satisfaction of any claim that I may have against Ozzie's Pipeline Padder, Inc. and/or ESI Energy Services Inc. arising out of my employment and termination of my employment . . ..

(Mot. Summ. J. at 20; Ex. J.)  By the terms of that agreement, Ensey received two weeks pay, all remaining earned vacation pay, and benefits until the end of the month in which he signed the agreement.  Ozzie's claims that this language unambiguously waives Ensey's claims in this case and entitles Ozzie's to summary judgment in its favor.

Ensey responds by arguing that the waiver does not apply to this case because Ensey's injuries did not arise out of his employment with Ozzie's.  Ensey argues that he had a break in employment with Ozzie's, notably when he went to work for Rockford and sustained his injuries.  Ensey claims that after the accident, Ozzie's hired him in a different capacity to participate in its management training program.  According to Ensey, the waiver only applies to his employment as a management trainee and does not pertain to his employment with Rockford as a machine operator.

The New Mexico Supreme Court has explained the law in this area as follows:

> even if the language of the contract appears to be clear and unambiguous, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear. The court is no longer restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous.

> New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity. The present law in this state concerning the interpretation of ambiguous or unclear language in written agreements may be summarized as follows: An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear.  If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists.

>At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder . . ..

*Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)(internal citations omitted).

This issue presents somewhat of a close call in this case.  The language of the waiver on its face appears unambiguous, but when read in light of the course of dealing between Ozzie's and Ensey and each party's divergent understanding of Ensey's employment status, the waiver's exact meaning and effect becomes more ambiguous. While Ozzie's urges the Court to look only at the plain language of the waiver, the New Mexico Supreme Court has made clear that the Court may look to extrinsic factors to determine ambiguity.  The Court finds the deposition testimony Ensey cites in his response to be particularly informative on this issue.  Specifically, Ensey cites the deposition testimony of Ozzie's General Manager, Tom Sarauskas, who stated:

>Q (by Mr. Yarbrough): Was your was it your intention to secure a full release of any potential claims that Mr. Ensey could have had against Ozzie's at that time?
>
>A (by Mr. Sarauskas): No. My intention was that there would be full release on any claims against Ozzie's. Now, let me qualify that. That is the intention and the wording, not specifically with any potential lawsuit but specifically for any claims that he might have against Ozzie's because of his termination.
>            . . .
>
>Q (by Mr. Houliston): Let me follow up on a few things. Exhibit 4, that was in no way intended on your part to have Mr. Ensey relinquish any rights he had to sue Ozzie's as a result of his accident; correct?

. . .

THE WITNESS: It was intended to
release all claims against Ozzie's.

Q (by Mr. Houliston):  Including his
accident that occurred in October of 2

A Because-

Q Let me finish my question.
including his accident that
happened in October of 2005?

A It was intended to relinquish any
claims against Ozzie's because of his
termination.

Q Because of his termination rights, and
his termination was not related to the accident;
correct?

A No.

Q Okay. So what this document purports
to do is to say once you are hired and then
terminated from Ozzie's, this is going to
release any claims as a result of your
termination that you believe you may have;
correct?

A Yes.

(Resp. at Ex. C.)  This exchange suggests that the interpretation of the waiver provision

depends largely on the reader's understanding of the period of employment and what

claims arise out of that employment and relate to its termination. Accordingly, the

language of the waiver is not as unambiguous as Ozzie's suggests and its precise

meaning is more properly decided by a jury than by the Court on summary judgment.

Therefore, the Court determines that Ozzie's motion for summary judgment based on

Ensey's alleged waiver of his claims should be denied.

## V.    Punitive Damages

Ozzie's also moves for summary judgment on Ensey's claim for punitive damages, arguing generally that the evidence fails to show that Ozzie's had a culpable state of mind.  Ozzie's argues that the facts of this case show, at most, that Ozzie's was negligent and in no way support a finding that Ozzie's was "consciously aware of the wrongfulness of its conduct or that it acted with the requisite culpable mental state necessary to justify punitive damages."  (Mot. Summ. J. at 23.)  To the contrary, Ozzie's argues, the evidence shows that Ozzie's made a reasonable effort to train Ensey and that Ensey himself has stated that he was not aware of anyone at Ozzie's that wanted Ensey to get hurt.

In response, Ensey argues that the evidence supports a claim for punitive damages based on the following factors, "(1) Ensey was gravely injured; (2) Ozzie's equipment design, training and safety practices all evidence reckless disregard for safety; (3) Ensey, as a person supporting a family was financially vulnerable to a potentially life-threatening injury; (4) and Ozzie's wrongful practices are long-standing." (Resp. at 22.)

To obtain an award of punitive damages, the plaintiff "must introduce evidence suggesting a culpable mental state and conduct rising to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." *See Torres v. El Paso Elec. Co.*, 1999-NMSC-029,¶ 27, 127 N.M. 729, 987 P.2d 386 overruled in part on other grounds by *Herrera v. Quality Pontiac*, 2003-NMSC-018, 134 N.M. 43, 73 P.3d 181.  Mere negligence, even gross negligence, is not sufficient to justify an award of punitive damages.  Instead, the plaintiff must demonstrate that the defendant was consciously indifferent to the

potential for harmful consequences.  *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 211, 880 P.2d 300, 308 (1994).

Whether a claim for punitive damages is appropriate in this case will depend on the evidence presented and the testimony elicited at trial.  As discussed above, Ensey has so far presented evidence that could lead a jury to conclude that Ozzie's was negligent, and thus it will be for the jury to decide the extent of that purported negligence.  Therefore, the Court will defer ruling on this issue until the conclusion of Ensey's case-in-chief at trial.

## VI.    Request for Finding of Negligence

Finally, Ozzie's requests that the Court find, as a matter of law, that Ensey was negligent.  Ozzie's argues that Ensey as much as conceded his own negligence by stating that it was a "brief stupidity second" to step on the moving conveyor.  Accordingly, Ozzie's contends that Ensey's statement establishes that he failed to exercise ordinary care and justifies a finding by the Court that Ensey was negligent, which would allow the jury to apportion fault accordingly at trial.

Ensey responds that Ozzie's request for a finding of negligence is unsupported by law and would invade the province of the jury.  Additionally, Ensey asserts that his statement regarding his "brief stupidity second" is not an admission of negligence, but, rather, is simply additional evidence that the jury should consider at trial.

Establishing negligence requires a showing of the existence of a duty, a breach of that duty, a causal connection between the conduct and the resulting injury, and damages resulting from such conduct. *Parker v. E.I. DuPont de Nemours & Co., Inc.*, 121 N.M. 120, 130, 909 P.2d 1, 11 (Ct. App. 1995).  "Determining the existence of a duty

is a question of law for the court, whereas breach of duty and proximate cause are questions of fact for the jury." *Lessard v. Coronado Paint & Decorating Center, Inc.*, 2007-NMCA-122, ¶ 27, 142 N.M. 583, 168 P.3d 155 (internal citations omitted).

Ozzie's places greater emphasis on Ensey's statement than is warranted. Ensey's statement is a hindsight observation that does not necessarily amount to an admission of negligence. The jury in this case will be asked to assess whether Ensey was negligent *at the time of the accident*, i.e. whether it was negligent for Ensey to step on, what he claims was, a slow moving conveyor given that others allegedly routinely straddled the conveyor and stood on other parts of the machine. Certainly, the jury will be able to consider Ensey's statement in making that determination, but they must also be allowed to consider his statement in the context of the other evidence and testimony presented. Because reasonable jurors could disagree on whether Ensey was negligent, the Court declines to make a preliminary finding of negligence and will leave the resolution of that issue to the jury at trial. Therefore, the Court concludes that Ozzie's motion to find Ensey negligent as a matter of law should be denied.

## CONCLUSION

A genuine, material factual dispute exists with respect to Ensey's employment status with Ozzie's at the time of his accident, Ozzie's alleged negligence in training, supervising, and warning OPP-300 operators regarding the dangers of the machine, and whether Ensey has waived his claims in this case. However, Ensey has failed to set forth any admissible evidence regarding a defect in the OPP-300. Finally, whether Ensey was negligent and whether punitive damages are appropriate are issues properly reserved for trial.

**IT IS THEREFORE ORDERED THAT:**

1) Ozzie's Motion for Summary Judgment by Ozzie's Pipeline Padder, Inc. (Doc. No. 49) is GRANTED as to Ensey's claim for strict product liability and for breach of warranty;

2) Ozzie's Motion for Summary Judgment by Ozzie's Pipeline Padder, Inc. (Doc. No. 49) based on the exclusivity provision of the New Mexico Worker's Compensation Act, Ensey's alleged waiver of his claims in this case, and as to Ensey's claim for negligence is DENIED;

3) Ozzie's request for a finding that Ensey was negligent is DENIED;

4) The Court will defer ruling on the viability of Ensey's claim for punitive damages until the conclusion of Ensey's case-in-chief at trial.


_____
SENIOR UNITED STATES DISTRICT JUDGE